## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PETER FRED,** | : | |
| **Plaintiff** | : | **3:12-CV-2480** |
| **v.** | : | **(JUDGE MARIANI)** |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA,** | : | |
| **DEPARTMENT OF** | : | |
| **TRANSPORTATION,** | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I. Introduction and Procedural History

In this action, Plaintiff, Peter Fred, brings a claim for retaliation under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Count I), as well as a claim for race discrimination under Title VII (Count II), national origin discrimination under Title VII (Count III), and a claim for violation of the Pennsylvania Human Relations Act (Count IV). The Plaintiff, in his prayer for relief, seeks a permanent injunction barring the Defendant Commonwealth "from discriminating or retaliating against Plaintiff on the basis of his race, national origin and/or any basis prohibited under federal and state law," (Compl., Doc. 1, at 10), and further seeks an order prohibiting Defendant from "continuing to maintain its illegal policy, practice or custom of discriminating or retaliating against employees based on their race and national origin." (*Id.*) Plaintiff also seeks an award of "actual damages," costs and expenses of this action and "reasonable legal fees as provided by applicable federal and state law." (*Id.*)

The Defendant, Commonwealth of Pennsylvania, Department of Transportation, has

moved for summary judgment (Doc. 22), and has filed a Statement of Material Facts

(SOMF) (Doc. 23) pursuant to Local Rule 56.1, as to which the Defendant submits there is

no genuine issue for trial and on the basis of which it asserts it is entitled to summary

judgment.

The matter has been fully briefed and is ripe for disposition. Accordingly, for the

reasons stated herein, Defendant's Motion for Summary Judgment will be granted.

## II. Statement of Undisputed Facts

The Plaintiff, Peter Fred, is an employee of the Pennsylvania Department of

Transportation (DOT) in the job title of Equipment Operator II. (Def's Statement of Material

Facts, Doc. 23, at ¶ 1). The Plaintiff began his employment with the Department of

Transportation as a seasonal employee in 2004. Thereafter, he was hired as a full-time

employee in June of 2006 as an Equipment Operator I for Pike County in Milford, PA. (*Id.* at

¶ 3). The Plaintiff's work schedules are divided in a winter and summer season and, from

the summer of 2008 through 2010, he worked out of the DOT Dome stockpile. (*Id.* at ¶ 7).

Plaintiff's hours would vary, depending on the season, as to the day or evening shift. (*Id.* at

¶ 8). Specifically, in the summer season, the Plaintiff worked from 7 a.m. to 3:00 p.m., and

during the winter season, he worked noon to 8 p.m. When a winter storm occurred, Plaintiff

worked from noon until midnight. (*Id.* at ¶ 9). While Plaintiff did not work at the DOT's Milford

garage, he would have to go to the garage on occasion as part of his job where he

2

interacted with the Milford Garage Equipment Manager, Joseph Hogan. (*See id.* at ¶¶ 12, 14, 26). The Plaintiff worked at the DOT Dome stockpile, which is located approximately two to three miles from the Milford garage. (*Id.* at ¶ 13). As noted, the Milford Garage Equipment Manager or foreman was Joseph Hogan from 2008 until his retirement in October, 2010. (*Id.* at ¶ 14). Hogan's immediate supervisor in 2008 to 2010 was Robert Collins, the DOT Pike County Manager. (*Id.* at ¶ 15). Joseph Hogan did not supervise the Plaintiff, as Plaintiff himself testified. (*Id.* at ¶ 17). While the parties disagree as to the duties and responsibilities of Mr. Hogan within the operation of the Department of Transportation garage, the parties agree that Hogan instituted a rule within the garage pursuant to which only one bag of chains were to be distributed to a single operator. (*Id.* at ¶ 22).[1]

The Plaintiff's foreman, during the December, 2008 winter season, was Keith Wood. (*Id.* at ¶ 25). Paragraph 26 of the Defendant's Statement of Material Facts states that "[i]n December, 2008, plaintiff and Steve Hughson were sent to the garage to get 6 bags of chains, one for each truck." The Plaintiff's response to this statement is "[d]enied as stated. Plaintiff went to get the chains at the direction of Keith Woods." (Pl.'s Answ. to Def.'s Statement of Mat. Facts (ATSOMF), Doc. 31-1, at ¶ 26). While Plaintiff thus denies Paragraph 26 of Defendant's Statement of Material Facts, the substance of the Defendant's statement that the Plaintiff was sent to the garage to get six bags of chains is admitted.

---

[1] The reference to "chains" is to tire chains that are affixed to the tires of a vehicle to improve traction in adverse weather conditions.

Similarly, Paragraph 27 of Defendant's Statement of Material Facts states that

"Plaintiff grabbed six bags of chains from the garage and put them in his truck." Plaintiff's

response to this Statement of Material Fact is "[d]enied as stated. Plaintiff went to get the

chains at the direction of Keith Woods." (ATSOMF at ¶ 27). Thus, here again, Plaintiff

admits the substance of Defendant's Statement.

The Defendant asserts that Hogan stopped the Plaintiff and his co-worker and

questioned where he was going with the chains. Defendant further asserts that Hogan told

the Plaintiff that he was not allowed to take the chains as only one bag of chains were to be

signed out per employee. (SOMF at ¶¶ 28-29). The Plaintiff's response, in part, is: "Denied.

Plaintiff's testimony speaks for itself." (ATSOMF at ¶ 28). Plaintiff's deposition testimony is

as follows:

> Q.    When you went to the shed or the garage, what happened?
> A.    I grabbed six bags of chains and put them in the truck, in the crew cab.
> Q.    Uh-huh (yes).
> A.    And Mr. Hogan asked where I was going with the chains. I told him I
>       was taking them up to the dome to get prepared for the storm. And he
>       said, I wasn't allowed to take six bags of chains, that he would have
>       me for theft of state property. I told him the chains were needed for the
>       trucks due to the storm coming in.

(Peter Fred Dep., Nov. 21, 2013, Doc. 24-1, at 26:15-25). Thus, Plaintiff's denial of

Paragraph 28 of Defendant's Statement of Material Facts on the basis that the Plaintiff's

testimony "speaks for itself" is not a proper denial. The Plaintiff's deposition testimony is in

accordance with Defendant's Statement at Paragraph 28 and the same is therefore

admitted.

The Defendant asserts and the Plaintiff admits that with respect to the chain incident, upon return to the Dome stockpile, Plaintiff Fred reported to his supervisor, Keith Wood, that Hogan called him a "fucking spic" and told him to "go back where he came from" and accused of him stealing the chains. (SOMF at ¶ 31). The Plaintiff's supervisor, Keith Wood, told the Plaintiff he would talk to County Manager Robert Collins about the Hogan incident and the chains. (*Id.* at ¶ 32).

As a result of the Plaintiff's allegations described above, a meeting was held approximately one month later regarding the chain incident and Hogan. Present at the meeting were County Manager Collins, Mr. Hogan, Plaintiff's Union Representative, Lee Brown, Steve Hutchinson and the Plaintiff. (*Id.* at ¶ 33). At this meeting, the Plaintiff complained that Hogan harassed him and accused him of stealing chains. (*Id.* at ¶ 34). The parties dispute the substance of the discussion at the meeting held on Plaintiff's complaint against Hogan, but they agree County Manager Collins asked the Plaintiff and Hogan to set aside their differences and try to get along. (*Id.* at ¶ 38).

The parties dispute whether the Plaintiff filed a formal Complaint with the DOT or a Union Grievance after the meeting but they agree that the Plaintiff filed a Complaint with the EEOC on or about February 8, 2010. (*Id.* at ¶ 39). The Plaintiff admits that County Manager Collins testified that a promotion from an Operator A to an Operator B position is governed by the collective bargaining agreement and is subject to position vacancy, seniority and a bidding process. (ATSOMF at ¶ 40). The Defendant asserts, in Paragraph 41 of its

5

Statement, that in October of 2009, pursuant to the collective bargaining agreement, County Manager Collins promoted the Plaintiff to an Equipment Operator B. Plaintiff admits only that he went from a temporary to a full-time position. (*Id.* at ¶ 41).

Plaintiff further admits that he made a complaint in December of 2009 that Hogan had referred to him as a "fucking asshole." (*Id.* at ¶ 42). Specifically, it is undisputed that the Plaintiff and co-worker, Bob Beltramine, were sent to the garage by their foreman, Scott Gillette, because the lights on the Plaintiff's truck were not working. (SOMF at ¶ 43). As the Plaintiff and Beltramine were exiting the garage, Hogan called both of them "fucking assholes". (*Id.* at ¶ 44).

On December 8, 2009, the Plaintiff filed a Union Grievance alleging that he was "verbally accosted and demeaned by Joe Hogan every time they have to deal with [each] other." (*Id.* at ¶ 45).

The Plaintiff contacted the Department of Transportation Equal Opportunity section and told them he was being harassed and working in a hostile work environment because of Joe Hogan. (*Id.* at ¶ 46). The Defendant asserts that County Manager Collins conducted an investigation into Plaintiff's allegations and a pre-disciplinary conference (PDC) was conducted regarding Hogan's work performance, including the December 6, 2009 incident with the Plaintiff. (*Id.* at ¶ 47). The Plaintiff admits that a pre-disciplinary conference was conducted with respect to Hogan but asserts that whether the PDC was conducted because

6

of Hogan's work performance or because of his hostile and racist behavior is a disputed issue of material fact for trial. (ATSOMF at ¶ 47).

Plaintiff admits that County Manager Collins testified that Hogan received a 5-day suspension for calling Plaintiff a "fucking spic". (*Id.* at ¶ 49).

On January 11, 2010, the Plaintiff complained that Hogan took a picture of Plaintiff and two other employees while they were getting into a DOT truck and that he then followed them. (SOMF at ¶ 50). Hogan had been issued a camera and, as a result of the complaint by the Plaintiff, County Manager Collins went to the garage and took the camera from Hogan. (*Id.* at ¶¶ 51-52). The Defendant conducted another pre-disciplinary conference with respect to Hogan regarding the allegation that he had told Union Representative Lee Brown that Plaintiff was playing the race card and that he would "take care" of him. (*Id.* at ¶ 55). At the PDC, Hogan denied making this statement to Brown. (*Id.* at ¶ 56). On January 26, 2010, the Union withdrew Plaintiff's Grievance filed on January 8, 2010. (*Id.* at ¶ 57). As a result of the PDC, Hogan was suspended without pay for five days with a final termination warning. (*Id.* at ¶ 58). Plaintiff's response to this statement is "[d]enied as stated," with a reference to Paragraph 49 of the Plaintiff's Response, wherein the Plaintiff acknowledges that Collins testified that Hogan received a 5-day suspension for calling Plaintiff a "fucking spic" and that Hogan later received "yet another suspension." (ATSOMF at ¶ 58). Therefore, this is not a proper denial.

Hogan retired from the Department of Transportation in October of 2010. (SOMF at ¶ 59). The Plaintiff continues to be employed by DOT as an Equipment Operator B. (*Id.* at ¶ 60).

The Plaintiff states that Mr. Hogan called him a fucking spic on two occasions, the first taking place with respect to the chain incident in 2008 and the second, at another unidentified time in the garage. (*Id.* at ¶ 62).

### III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a

8

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct.

3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson,* 477 U.S. at 248. Rather, the opposing party must point to a factual

dispute requiring trial and the district court "may limit its review to the documents submitted

for the purposes of summary judgment and those parts of the record specifically referenced

therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030-1031 (9th Cir.

2001); *see also Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994). "Inferences should be

drawn in the light most favorable to the non-moving party, and where the non-moving

party's evidence contradicts the movant's, then the non-movant's must be taken as true."

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert.

denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## IV. Analysis

The Defendant, Department of Transportation, moves for summary judgment on

several grounds. First, the DOT asserts that Plaintiff's claim that in December of 2008,

Garage Maintenance Foreman Hogan called him a "fucking spic" is barred by Plaintiff's

failure to timely file a Charge of Discrimination with the EEOC or the Pennsylvania Human

Relations Commission (PHRC). (*See* Def.'s Br. in Supp. of Mot. for Summ. J., Doc. 25, at

6.) In a deferral state, such as Pennsylvania, a claim with the Pennsylvania Human

Relations Commission is duly filed with the U. S. Equal Employment Opportunity

9

Commission, which allows a claimant to file his complaint within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1). However, the 300-day statute of limitations only applies to allegations in support of a plaintiff's Title VII claim, not claims brought pursuant to the PHRA. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (concluding that plaintiff's PHRA claims were time-barred because "[t]he 300-day extended statute of limitations applies only to the Charge, not to the PHRA filing").

Defendant correctly asserts that the Plaintiff filed an Administrative Charge with the EEOC on January 14, 2010 and cross-filed with the PHRC. (*Cf.* Doc. 25 at 6; Compl. at ¶ 12). Thus, Defendant argues that Plaintiff's Title VII claims "are timely only as to those discrete actions that occurred on or after March 23, 2009. (300 days prior to the January 14, 2010 filing)." (Doc. 25 at 6).

Plaintiff does not challenge the untimeliness of his Charge of Discrimination to the EEOC as it relates to the December, 2008 claim that Garage Manager Hogan directed a profane, racial and ethnic slur against him. Instead, Plaintiff, citing *Hammer v. Cardio Medical Products, Incorporated*, 131 Fed. App'x 829 (3d Cir. 2005), argues that after the December, 2008 utterance of the "fucking spic" epithet, "Plaintiff was 'lulled' into foregoing prompt attempts to vindicate his rights." (Pl.'s Br. in Opp. to Def.'s Mot. for Sum. J., Doc. 31, at 4). In *Hammer,* the Plaintiff failed to file her Title VII Charge of Discrimination with the EEOC within 300 days of the alleged unlawful practice as she was required to do. *Hammer*,

131 Fed. App'x at 831. Plaintiff filed her Charge with the EEOC 581 days after the

limitations period had started, thus making her Charge untimely. *Id.* The Court, in vacating

the District Court's Order granting the employer's motion to dismiss and remanding the case

for further proceedings, stated:

> It is well established, however, that a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to filing suit under Title VII or the ADEA. Rather, it is a requirement more in the nature of a statute of limitations which is subject to equitable tolling. *See Courtney v. LaSalle Univ.*, 124 F.3d 499, 505 (3d Cir. 1997); *see also Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1392 (3d Cir. 1994). Equitable tolling may be appropriate where a plaintiff has "been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999). Likewise, equitable tolling may apply "where the employer's own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate [her] rights." *Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977); *see also, Oshiver*, 38 F.3d at 1388 (noting that "the fundamental rule of equity that a party should not be permitted to profit from its own wrongdoing" is the "basic principle" underlying the equitable tolling doctrine). Hammer bears the burden of proving that the equitable tolling doctrine applies.

*Id.*

The plaintiff in *Hammer* alleged that equitable tolling was appropriate because, *inter*

*alia*, Cardio Medical had failed to post any information concerning her statutory rights under

Title VII or the ADEA. *Id.*

The Court noted that employers are required to post "in conspicuous places" notices

of fair employment practices, including descriptions of pertinent provisions of Title VII and

the ADEA, 42 U.S.C. § 2000e-10(a) and 29 U.S.C. § 627. *Id.* The Court next observed that

"[w]e have stated that equitable tolling may apply if the plaintiff can demonstrate 'excusable

ignorance' of her statutory rights, where for instance her employer has failed to post the required notices." *Id.* at 831-32.

Continuing in its analysis, the Court observed that whether a plaintiff has demonstrated "excusable ignorance" of his statutory rights "is a fact-intensive test" involving several "equitable factors." *Id.* at 832. It then noted that *Hammer* had "averred that she was unaware of her rights until July 29, 2000 when she first obtained knowledge of these rights from a friend." *Id.* This assertion of the failure to post by the employer as a ground for tolling the limitations period presented the basis for the Court's vacating of the District Court's dismissal of the plaintiff's action and its remand of plaintiff's suit. *Id.*

### A. Plaintiff's EEOC Filing With Respect to the December, 2008 Incident and Utterance Is Untimely

In this case, Plaintiff Fred has not come forward with evidence showing a genuine issue for trial as to whether he was unaware of his statutory rights and, if so, when he learned of those rights in connection with the December 2008 utterance by Hogan of the racial/ethnic epithet. Thus, the Plaintiff's case here does not fall within the factual matrix of *Hammer*. Further, unlike the instant Plaintiff, the plaintiff in *Cardio* was *pro se* and her case was dismissed at the pleading stage. Here, by contrast, the Plaintiff has had an opportunity to present evidence showing "excusable ignorance" of his statutory rights and has not done so. Instead, the Plaintiff has argued in his Brief opposing the DOT's Motion for Summary Judgment that he was "lulled" into "foregoing prompt attempts to vindicate his rights." (Doc. 31 at 4). In support of this assertion, Plaintiff cites to Paragraphs 33 through 39 of its

12

response to the Defendant's Statement of Undisputed Material Facts. (Id.). As discussed

above, Plaintiff admits the facts set forth in Paragraphs 33 and 34 of the Defendant's

Statement of Material Facts which establish that as a result of the Plaintiff's report to his

supervisor that Garage Manager Hogan called him a "fucking spic," a meeting was held a

month later regarding the chain incident during which the racial epithet was uttered. The

meeting was attended by County Manager Collins, Garage Manager Hogan, Union

Representative, Lee Brown, Steve Hutchinson and the Plaintiff. At the meeting, the Plaintiff

complained that Hogan was harassing him and had accused him of stealing chains. (See

SOMF at ¶¶ 33-34; ATSOMF at ¶¶ 33-34).

As to Paragraphs 35, 36 and 37 of the Defendant's Statement of Material Facts,

Plaintiff has responded in each instance that the statements of fact are denied "as a

mischaracterization of Collins' testimony, which speaks for itself." (ATSOMF at ¶¶ 35-37).

Collins' deposition testimony, cited as the basis for Paragraphs 35, 36 and 37 of

Defendant's Statement of Material Facts and which Plaintiff argues speaks for itself, states:

- Q.   Okay. Did you ever have a meeting with Mr. Wood about my client and his allegations against Mr. Hogan?
- A.   We had a meeting once about chains. And I believe Keith Wood was involved, and I had Mr. Fred there, Joe Hogan, union official. I believe it was Lee Brown, an assistant from the area, to go over the policies of the chain. I guess one time Pete took six or seven bags of chains, and Joe was upset about that.
- Q.   Okay.
- A.   And then we did have a policy that the operators get their own chains. We had a discussion about it, cleared it up in the office. Everybody agreed just to let it go and see what happens in the future. And that was an agreement between management and the union.

13

Q.    So during that meeting about the chains were any of my client's
       concerns about Mr. Hogan's comments discussed?
A.    It was just that Mr. Hogan gave him a hard time accusing him of
       stealing chains.
Q.    At that meeting were you aware that Mr. Hogan had called my client a
       spic or something to that effect? . . .
A.    If I'm not mistaken I think that issue came up after that.

(Robert Collins Dep., Nov. 22, 2013, Doc. 24-3, at 31:25-32:24)

       As to Paragraph 38, again the deposition testimony of County Manager Collins is

cited by the Defendant as the basis for Defendant's statement that "Collins asked that

Plaintiff and Hogan to set aside their differences and to try to get along. An agreement was

reached between Management and the Union Representative to let the incident go and see

what happens in the future."

       Plaintiff in response states "[i]t is admitted that Collins so testified." (ATSOMF at ¶

38).

       Plaintiff has denied the statements set forth in Paragraph 39 of Defendant's SOMF,

specifically that the Plaintiff after the meeting did not file a written or formal complaint with

the DOT or a grievance through his Union regarding the chain incident, but did file a

grievance concerning Hogan in 2009 and contacted the DOT EEO in 2009. (Id. at ¶ 39).

Plaintiff admits only that he filed a Charge with the EEOC in February of 2010. (Id.) Yet,

Plaintiff, when asked at his deposition whether he ever filed a complaint with the PennDOT

EEO, responded, "I believe I did, yes." (Doc. 24-1 at 40:18-20).

14

Under *Hammer*, equitable tolling may be appropriate "where the employer's own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate [his] rights." *Hammer*, 131 Fed. App'x at 831; *see also Benard v. Washington Cnty.*, 465 F. Supp. 2d 461, 471 (W.D. Pa. 2006) (citing *Hammer*).

Here, nothing in the record evidence shows any act or omission by DOT that may be said to have "lulled" the Plaintiff into foregoing the filing of his Charge of Discrimination with the EEOC. The meeting which followed the December, 2008 chain incident and racial epithet utterance resulted, according to the uncontradicted testimony of County Manager Collins, in an agreement described by him as "[e]verybody agreed just to let it go and see what happens in the future. And that was an agreement between management and the union." (Doc. 24-3 at 32:11-13).

Given that it is undisputed that there is a Collective Bargaining Agreement between DOT and Plaintiff's Union covering the terms and conditions of employment of Plaintiff and other members of the bargaining unit employed by DOT at its Pike County location and, further, given that DOT and the Union representing its employees have a statutory duty under the Pennsylvania Public Employee Relations Act, 43 Pa. C.S.A. § 1101.101, *et seq.*, to meet and attempt to resolve disputes arising under the Collective Bargaining Agreement, the agreement by Management and the Union to "let it go and see what happens in the future," cannot be fairly characterized as an act or omission which could have lulled the Plaintiff into failing to timely file his EEOC Complaint. Nor may it be said that the

15

Defendant's conduct in this case caused Plaintiff Fred to delay bringing his Charge of Discrimination. The record shows no evidence that would present an issue for trial that any relief or remedy of any kind was promised to Plaintiff Fred by DOT as a result of the meeting after the December, 2008 chain incident which could reasonably have been viewed by the Plaintiff as a basis or reason to delay the filing of his EEOC Charge. The meeting did not produce so much as a promise from Hogan that he would refrain from the use of such racial/ethnic epithets or a directive from Hogan's superiors that he refrain from doing so. To summarize, affording the Plaintiff every favorable inference from the evidence of record, Plaintiff has failed to create a genuine issue of fact for trial as to whether he was lulled into a false sense of security and into postponing his complaint to the authorities as a result of the meeting held after the December, 2008 incident, the statements made at that meeting or as a result of the outcome of that meeting.

Moreover, the Plaintiff testified at his deposition that when he began his employment with PennDOT, he received a number of "employee handouts." (Doc. 24-1 at 16:15-17:1). One such handout is an Employee Orientation Checklist, which is included as Exhibit 1 to the Plaintiff's Deposition Transcript. (See id. at 66). This document contains a Certification signed by the Plaintiff that "[t]he items marked above have been discussed with me and I have received the information provided during in-processing." (Id.) The information referenced includes the following: Harassment/Hostile Work Environment Policy, Equal Employment Opportunity Policy Statement, and EEO Code Documentation. When asked

whether he remembered receiving any of that information, Plaintiff responded, "Yes, I do," and offered that he had read the information as well. (*See id.* at 17:1-16). Thus, Plaintiff Fred, unlike Hammer, cannot claim to have been unaware of his rights under the relevant law.

The Plaintiff's account of the meeting following the December, 2008 chains/racial epithet incident provides no basis for a claim that he was lulled into foregoing the filing of a timely EEOC Charge of Discrimination in connection with that incident. Thus, the Plaintiff testified: "And Mr. Collins asked Hogan to set his differences aside and try to get along with me and that was the end of the conversation. Everything was supposed to have been fine after that." (*Id.* at 29:12-15).

Nothing in the Plaintiff's testimony or his account of the meeting of December, 2008 incident presents any triable issue of fact that the Defendant engaged in an act or omission designed to or that had the effect of causing the Plaintiff to relax his vigilance or to delay the filing of his EEOC Charge of Discrimination.

Thus, with respect to the December, 2008 utterance by Hogan of a racial epithet, an utterance not asserted by Plaintiff as anything other than a discrete act of discrimination, Plaintiff's claim as to that specific utterance is barred as untimely filed with the EEOC.[2]

---

[2]Alternatively, Plaintiff seeks leave to amend his Complaint to include a claim alleging violations of 42 U.S.C. § 1981, which is subject to a 4-year statute of limitations. (Doc. 31 at 5 n.1). In *McGovern v. City of Philadelphia*, 554 F.3d 114 (3d Cir. 2009), the Third Circuit, relying on *Jett v. Dallas Independent School District*, 491 U.S. 701, 731, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989), in which the Supreme Court held that Section 1981 does not itself provide a remedy against state actors, held that "because Congress neither explicitly created a remedy against state actors under Section 1981(c), nor expressed its intent to

## B. Plaintiff's Claims Under Title VII

Plaintiff's claims under Title VII also fail as a matter of law because there is no evidence of record creating an issue for trial as to whether the Plaintiff sustained any adverse employment action in this case.

For purposes of the analysis as to whether the Plaintiff has established a *prima facie* case of race or national origin discrimination under Title VII as well as a *prima facie* case of retaliation,[3] the Court will consider the December, 2008 chain incident and the racial/ethnic epithet uttered by Garage Manager Hogan notwithstanding the previous discussion with respect to the untimeliness of Plaintiff's EEOC Charge as to that incident and utterance. Thus, the undisputed facts which must be considered in determining whether the Plaintiff has made out a *prima facie* case of discrimination or a hostile work environment are as follows: Plaintiff states that Garage Manager Hogan called him a "fucking spic" on two occasions. The first occasion was in connection with the chain incident in December of 2008 and the second was at another unidentified time in the garage. (SOMF at ¶ 62). It is also undisputed that the Plaintiff reported to his supervisor that Hogan, in addition to uttering the racial/ethnic slur, also told him to "go back where he came from" and accused him of stealing the chains. (*Id.* at ¶ 31).

---

overrule *Jett*, we hold that 'the express cause of action for damages created by Section 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in Section 1981 by state governmental units.'" *McGovern*, 554 F.3d at 121 (citing *Jett*, 491 U.S. at 733). Accordingly, Plaintiff's attempt to seek refuge under Section 1981 must be rejected consistent with Supreme Court and Third Circuit case law.

[3] Plaintiff, in his Brief opposing Defendant's summary judgment motion, states "Plaintiff is not pursuing a hostile-work environment claim." (Doc. 31 at 15).

Plaintiff made a Complaint in December, 2009 that Hogan had referred to him as a "fucking asshole." (*Id.* at ¶ 42). The incident occurred when Plaintiff and a co-worker, Bob Beltramine, were sent to the garage by their foreman because the lights in the Plaintiff's truck were not working. (*Id.* at ¶ 43). As Plaintiff and Beltramine were exiting the garage, Hogan called both of them "fucking assholes". (*Id.* at ¶ 44).

Also, on January 11, 2010, the Plaintiff complained that Hogan had taken a picture of him and two other employees while they were getting into a DOT truck and that Hogan followed them. (*Id.* at ¶ 50). The Plaintiff made a complaint with respect to this incident and, as a result, County Manager Collins went to the garage and took the camera from Hogan. (*Id.* at ¶ 52).

A pre-disciplinary conference (PDC) was conducted with respect to Hogan on an allegation that he had told Lee Brown that Plaintiff "was playing the race card and that he would 'take care' of him." (*Id.* at ¶ 55).

From 2008 to February of 2010, the Defendant asserts that Plaintiff made four complaints to his supervisors regarding Hogan. (*Id.* at ¶ 63). The Plaintiff responds that "the record supports the contention that Plaintiff made numerous complaints about Hogan, either informally or formally." (ATSOMF at ¶ 63).

Finally, although Plaintiff has denied the Statement of Fact in Paragraph 41 of Defendant's Statement of Material Facts with respect to whether he was promoted, (*see id.*

19

at ¶ 41), this denial is completely at variance with the Plaintiff's own testimony that he was

in fact promoted to Equipment Operator B. The Plaintiff testified:

> Q.    I am going to show you what we are going to mark as Exhibit Two. It's
>        a letter dated October 30, 2009 to you from Mr. Collins. Does that
>        refresh your recollection a little bit? So in October of 2009, you were
>        promoted to equipment operator B?
> A.    Yes.

(Doc. 24-1 at 35:8-17)

Exhibit 2 to the Deposition of the Plaintiff is of record in this case. It is an October 30,

2009 letter from Robert J. Collins, Highway Maintenance Manager, to the Plaintiff that states

in part:

> On behalf of the District Executive, I want to congratulate you on your
> promotion to the position of Transportation Equipment Operator B in the Pike
> County Maintenance Organization 4-4, in Milford, Pennsylvania effective
> October 17, 2009 at an hourly rate of $17.77, at Pay Range 4, Step 10. You
> remain in the J-1 bargaining unit.

(*Id.* at 67).

Defendant contends that summary judgment should be entered in its favor because

the Plaintiff has not suffered any "adverse employment action." (Doc. 25 at 8). Defendant

relies upon the decision in *Storey v. Burns International Security Services*, 390 F.3d 760 (3d

Cir. 2004). In *Storey*, the plaintiff brought suit under Title VII, alleging that Burns discharged

him because of his national origin and religion. The Circuit Court, in affirming the dismissal

of the plaintiff's claim in *Storey* explained:

> Under the familiar *McDonnell Douglas* burden shifting test, a Title VII plaintiff
> bears the initial burden of establishing a *prima facie* case of discrimination by

a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Although the *prima facie* elements of a discrimination claim vary depending on the particular facts of the case, *Sarullo v. U.S. Postal Service,* 352 F.3d 789, 797-98 (3d Cir. 2003) (per curiam), the plaintiff must generally present evidence that "raises an inference of discrimination." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (citations omitted).

*Storey,* 390 F.3d at 763-764.

Further, the Court in *Storey* made clear that a person seeking relief under Title VII

"must have suffered a cognizable injury." *Id.* at 764.

The Court concluded:

Thus, only a person "claiming to be aggrieved" may bring an action under Title VII. *See* 42 U.S.C. § 2000e-5. We have defined "an adverse employment action" under Title VII as an action by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir. 2001) (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir. 1997)).

*Id.*

The requirement that a plaintiff have suffered an adverse employment action is also

a necessary element of a retaliation claim under Title VII. Thus, in *Moore v. City of*

*Philadelphia,* 461 F.3d 331 (3d Cir. 2006), the Court, in reversing the District Court's grant

of summary judgment on the basis that the plaintiffs had raised genuine issues of material

fact as to whether defendants had violated the anti-retaliation provisions of Title VII, stated:

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there

21

was a causal connection between her participation in the protected activity and the adverse employment action." *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995).

*Moore,* 461 F.3d at 340-341.

A review of the record in this case leaves no question that the Plaintiff has not

suffered "an adverse employment action" under Title VII that is "serious and tangible

enough to alter an employee's compensation, terms, conditions or privileges of

employment." *See Storey,* 390 F.3d at 764. Here, there is no evidence of record that

Plaintiff Fred was discharged or disciplined, that he was deprived of compensation or any

job benefit or that any of his working conditions or other terms of employment were altered

or affected by the actions or statements of Garage Manager Hogan or, for that matter, any

other agent of the Defendant. Simply put, no tangible action was taken by the Defendant

against Plaintiff Fred. In *Walker v. Centocor Ortho Biotech, Inc.,* 558 Fed. App'x 216 (3d Cir.

2014), the Court affirmed the grant of summary judgment to the employer in an action

brought in which the plaintiff employee alleged racial discrimination, retaliation and hostile

work environment claims under Section 1981. The plaintiff asserted nine events which she

contended constituted adverse employment actions, including an alleged negative

performance review that plaintiff contended affected her compensation, her supervisor's

delays in approving expense reports, said supervisor's attempted realignment of her sales

territory, his assignment of certain drug launch programs to a white manager, his expression

of dislike for another African American sales representative, his failure to provide a budget

report to plaintiff, his questioning of plaintiff's hiring of a "minority transfer candidate," his requirement that plaintiff use a car rather than a train for some business travel, and his failure to provide plaintiff support in her management of three subordinates. *Walker*, 558 Fed. App'x at 219. The Court, citing its decision in *Storey v. Burns, supra*, began its analysis with the following statement: "Title VII and Section 1981 . . . do not provide relief for unpleasantness that may be encountered in the workplace. Rather, they provide a remedy only if discrimination seriously and tangibly altered the employee's ability to perform the job or impacted the employee's job benefits." *Id.* at 219.

The Court found that none of the events alleged by the plaintiff constituted adverse employment actions so "summary judgment on Walker's discrimination claim was appropriate." *Id.* at 220. The Court rejected the plaintiff's claim that she sustained an adverse employment action because of a negative evaluation, stating that a "negative evaluation by itself, is not an adverse employment action." *Id.*

With regard to the remaining eight events cited by the plaintiff, the Court found they did not constitute adverse employment actions, noting that "[s]ome of the events never actually had any tangible impact on Walker's employment," and that "[s]ome of the events she identified were not directed at Walker alone, suggesting that, even assuming they were adverse employment actions, there are no facts from which a reasonable fact finder could find they were motivated by discriminatory animus." *Id.* at 220. Here, Hogan's use of racial or ethnic slurs as well as his behavior when interacting with the Plaintiff, like the events cited

23

by the plaintiff in *Centocor*, "never had a tangible impact" on Fred's employment. Likewise, it is undisputed that when Hogan called the Plaintiff a "fucking asshole," he also directed that term at the Plaintiff's co-worker, Bob Beltramine. Thus, following the reasoning in *Centocor*, even assuming that the use of such language could constitute evidence of an adverse employment action, there are in this case no facts from which a reasonable fact finder could find they were motivated by discriminatory animus.[4]

It is worth noting that the focus of this Opinion is upon Mr. Hogan and his statements and actions since Plaintiff testified there was no one other than Mr. Hogan that he believed discriminated against him because of his race or national origin. (Doc. 24-1 at 51:14-17).

Because the record is devoid of any evidence of a serious and tangible action taken against the Plaintiff to alter his compensation, terms, conditions or privileges of employment, summary judgment must be entered on Plaintiff's discrimination and retaliation claims under Title VII. As Defendant notes, "Plaintiff was promoted, received a pay raise and continued in the terms and conditions of his employment with DOT." (Doc. 25 at 10).

Though the Defendant has argued that the Plaintiff has attempted to assert a hostile work environment claim, Plaintiff, as noted previously, in his Brief in Opposition to Defendant's Motion for Summary Judgment, asserts the contrary: "Plaintiff is not pursuing a hostile-work environment claim." (Doc. 31 at 15 n.4).

---

[4] Plaintiff testified that Mr. Beltramine is not Hispanic. (Doc. 24-1 at 37:20-21).

Yet, Plaintiff continues to argue that Hogan's statements to the Plaintiff and his treatment of him "at the shed" establish a tangible adverse action sufficient to support a claim of discrimination and/or retaliation. But Hogan took no tangible action against the Plaintiff; instead, at issue here is Plaintiff's assertion that Hogan used a racial or ethnic slur ("fucking spic") on two separate occasions; that he told the Plaintiff on one of those occasions that he should "go back where he came from" and that on another occasion, while the Plaintiff was at the DOT garage, Hogan yelled at him, asked him "what the fuck I was doing there" and called him and his co-worker "fucking assholes." (*See* Doc. 24-1 at 36:10-13; 37:9-11). While the making of these statements is disputed by Defendant, they do not present issues for trial since they do not present a violation of Title VII. As the Court held in *Perry v. Harvey*, 332 Fed. App'x 728 (3d Cir. 2009):

> [t]he Supreme Court has held that the "mere utterance of an [ethnic or racial] epithet which engenders offensive feelings in a [*sic*] employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (quotation omitted).

*Perry*, 332 Fed. App'x at 732.

Though the Plaintiff has stated that he is not pursuing a hostile work environment claim, and instead has argued that Plaintiff has suffered an adverse employment action at the hands or—perhaps more accurately—by the words of former Garage Manager Hogan, the decision in *Sanchez v. Sungard Availability Services LP*, 362 Fed. App'x 283 (3d Cir. 2010), in which the District Court dismissed Sanchez's hostile work environment and

25

retaliation claims because he was unable to establish a *prima facie* case on either claim, is

instructive. There, the plaintiff alleged that his supervisor, Cardenas, "made several

derogatory comments relating to Sanchez's Dominican nationality over a period of six

years." *Id.* at 287. As to these alleged discriminatory comments implicating Sanchez's

nationality, the Court expressed its agreement with the District Court, stating:

> [W]e agree with the District Court that they did not reach a level of sufficient
> severity or pervasiveness to alter the conditions of his employment. *See*
> *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275. There is no evidence in the record
> that the complained-of conduct ever interfered with Sanchez's ability to do his
> work. To the contrary, Sanchez stated that he was "routinely applauded for
> his great teamwork and willingness to both come in early and stay beyond his
> normal working hours in order to satisfy the company and its clients."
> (Complaint at ¶ 1.) Moreover, Sanchez does not assert that he was physically
> threatened by the comments. *See Harris*, 510 U.S. at 23, 114 S. Ct. 367.
> Therefore, while we agree that the comments may have been inappropriate,
> there is insufficient evidence in the record to suggest that a reasonable jury
> could conclude that the comments, when considered cumulatively, were
> sufficiently severe or pervasive. Accordingly, the District Court properly
> granted summary judgment on this claim.

*Id.*

In this case, the analysis employed by the Court in *Sanchez* results in a

determination that summary judgment should be granted to the Defendant. The two

occasions when Hogan referred to the Plaintiff as a "fucking spic" and his statement that the

Plaintiff should "go back where he came from," even when combined with the vulgar insult

which Hogan directed to the Plaintiff and his co-worker, Beltramine, do not reach the

requisite level of severity or pervasiveness to alter the conditions of the Plaintiff's

employment. To the extent that the Plaintiff cast his claim as one of a material adverse

26

action taken against him by virtue of these comments, that claim must likewise fail. No

adverse action can be inferred from the statements made by Hogan and the record does not

present a triable issue of fact that the Plaintiff suffered any loss or diminution of pay or

benefits, any opportunity to advance in pay, benefits, rank or employment status or any

alteration of the terms, conditions or privileges of his employment. To the contrary, the

record evidence is undisputed that the Plaintiff was promoted to the position of

Transportation Equipment Operator B, as set forth in the letter to him of October 30, 2009.

The Defendant cites *Exantus v. Harbor Bar & Brasserie Restaurant*, 386 Fed. App'x

352 (3d Cir. 2010), in support of its position. In *Exantus*, the District Court granted the

defendant's motion for summary judgment in an action brought by a discharged restaurant

employee who claimed that he was subject to a hostile work environment and that he was

discharged in retaliation for reporting discriminatory conduct, in violation of Title VII. The

plaintiff asserted that at various times, "staff members, including his immediate supervisor,

would refer to him as a 'Haitian Fuck.'" *Exantus*, 386 Fed.Appx. at 353. The Circuit, in

affirming the District Court, stated that the "District Court correctly ruled that the totality of

the circumstances was not sufficiently severe or pervasive to support a hostile work

environment claim." *Id.* at 354. It explained:

> While we agree with the District Court that the epithet "Haitian Fuck" is indeed
> unpalatable and inappropriate, the incidents appear to have been isolated,
> rather than pervasive and severe. There is also no evidence in the record to
> suggest that the complained-of conduct materially interfered with Exantus'
> ability to do his work. Moreover, Exantus does not assert that he was
> physically threatened by the comments.

27

*Id.*

The Court's reasoning in *Exantus* has application here. Hogan's statements are likewise "unpalatable and inappropriate" as well as highly offensive and insulting, but he made such statements only on two occasions and uttered another offensive, though arguably non-discriminatory, insult when he directed his vulgarity at both the Plaintiff and his co-worker, Beltramine.

Additionally, the Court's acknowledgment in a footnote in *Exantus* that there was a grievance procedure in place at the employer's location and that "management acted quickly in addressing Exantus' complaints" by conducting an internal investigation, *see id.* at 354 n.1, mirrors the facts of record in this case. Hogan's statements and actions were the subject of Pre-Disciplinary Conferences, which Plaintiff admits resulted in Hogan's suspension by Defendant. (ATSOMF at ¶ 49).

Plaintiff has not come forward with any evidence to show that Hogan's statements or actions were "serious and tangible enough to alter" his "compensation, terms, conditions or privileges of employment." *Cardenas,* 269 F.3d at 263. In this case, there is no evidence of record to raise a triable issue of fact that the Plaintiff was discharged, disciplined, denied promotion, reassigned with different job responsibilities or suffered any significant change in benefits. Plaintiff cites *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999), for the proposition that a disruption of working conditions may constitute an adverse employment action. However, the District Court found and the Court of Appeals agreed that

the plaintiff in *Evans* suffered a tangible adverse employment action in that the plaintiff had

been deprived of a secretary and a private office which were specific, negotiated conditions

of her employment with Durham. Thus, the Court observed: "Given Evans's need for office

support to sustain her successful way of doing her whole life insurance business, depriving

her of a secretary and an office could constitute a tangible adverse action even if none of

the agents had negotiated for those benefits." *Durham*, 166 F.3d at 153. Further, a

"significant disruption" in Evans's working conditions arose from the disappearance of her

files, which the District Court found made it "impossible" for Evans to work. The District

Court determined that their disappearance under suspicious circumstances was a tangible

adverse employment action. *Id.*

No such facts are present in this case where the evidence of record in this case does

not raise a triable issue of fact that Fred suffered any tangible adverse employment action of

the kind present in *Evans*.

Plaintiff also cites to *Chuang v. University of Cal. Davis, Bd. of Trustees*, 225 F.3d

1115 (9th Cir. 2000). However, as the Plaintiff concedes, the facts of *Chuang* are markedly

different from those in this case and present a case where the plaintiffs suffered significant

adverse actions, including denial of a full-time equivalent professor position together with

tenured faculty status, and suffered the forcible relocation of their laboratory space over

their objections. *Chuang*, 225 F.3d at 1120-23. This Court does not question any aspect of

the decision in *Chuang.* Nonetheless, *Chuang* does not support the Plaintiff's case here because no adverse employment action of any kind was taken against Plaintiff Fred.

## C. Plaintiff's Claims Under the PHRA

Plaintiff, in his Brief in Opposition to Defendant's Motion for Summary Judgment, has clearly indicated that he has abandoned his claims under the PHRA. In footnote 4, at page 15 of his Brief, Plaintiff states: "Plaintiff also concedes that in absence of waiver, the Defendant is protected by sovereign immunity on Plaintiff's PHRA claims." While the PHRA has been held to waive Pennsylvania's immunity from suit in state court, that waiver does not subject Pennsylvania to a PHRA suit in federal court.

No waiver of sovereign immunity has occurred. In *Williams v. Pennsylvania State Police - Bureau of Liquor Control Enforcement*, 108 F. Supp. 2d 460, 465 (E.D. Pa. 2000), the Court explained:

> While the PHRA has been held to waive Pennsylvania's immunity from suit in state court, *see Mansfield State Coll. v. Kovich,* 46 Pa. Cmwlth. 399, 407 A.2d 1387, 1388 (1979), that waiver does not subject Pennsylvania to a PHRA suit in *federal* court, *see Irizarry v. Pennsylvania Dep't of Transp.,* No. 98-6180, 1999 U.S. Dist. LEXIS 5890, at *13 (E.D. Pa. Apr. 19, 1999); *McLaughlin v. State System of Higher Educ.,* No. 97-1144, 1999 U.S. Dist. LEXIS 4325, at *17 n.4 (E.D. Pa. Mar. 31, 1999); *Fitzpatrick v. Pennsylvania,* 40 F. Supp. 2d 631, 635 (E.D. Pa. 1999). Indeed, Pennsylvania law, 42 Pa. C.S.A. § 8521(b), is quite explicit on this point: "Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States." Thus, a plaintiff may never pursue a PHRA claim against Pennsylvania or its agencies in federal court. For that reason, plaintiff's claims pursuant to the PHRA will be dismissed without prejudice.

*Williams,* 108 F. Supp. 2d 465.

In *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S. Ct. 900,

79 L. Ed. 2d 67 (1984), the Supreme Court stated that its decisions "establish that 'an

unconsenting State is immune from suits brought in federal courts by her own citizens as

well as by citizens of another state.'" *Pennhurst*, 465 U.S. at 100 (quoting *Emps. v. Missouri*

*Pub. Health & Welfare Dep't,* 411 U.S. 279, 280, 93 S. Ct. 1614, 1616, 36 L. Ed. 2d 251

(1973)). The Court added that

> [i]t is clear, of course, that in the absence of consent a suit in which the State
> or one of its agencies or departments is named as a defendant is proscribed
> by the Eleventh Amendment. *See, e.g., Florida Department of Health v.*
> *Florida Nursing Home Assn,* 450 U.S. 147, 101 S. Ct. 1032, 67 L. Ed. 2d 132
> (1981) (per curiam); *Alabama v. Pugh,* 438 U.S. 781, 98 S. Ct. 3057, 57 L.
> Ed. 2d 1114 (1978) (per curiam).

*Id.*

The Court in *Pennhurst* also noted that "[t]he Eleventh Amendment bars a suit

against state officials when the state is the real, substantial party in interest." *Id.* at 101

(internal quotation marks omitted) (collecting cases). Thus,

> "[t]he general rule is that relief sought nominally against an officer is in fact
> against the sovereign if the decree would operate against the latter." *Hawaii v.*
> *Gordon*, 373 U.S. 57, 58, 83 S. Ct. 1052, 1053, 10 L. Ed. 2d 191 (1963) (*per*
> curiam). And, as when the State itself is named as the defendant, a suit
> against state officials that is in fact a suit against a State is barred regardless
> of whether it seeks damages or injunctive relief. *See Cory v. White,* 457 U.S.
> 85, 91, 102 S. Ct. 2325, 2329, 72 L. Ed. 2d 694 (1982).

*Id.* at 101-102.

Here, Plaintiff does not present any argument opposing the Defendants' Motion for

Summary Judgment with respect to Plaintiff's claims under the PHRA for the reasons stated

31

above. Because Plaintiff's claims brought under the PHRA fail as a matter of law, summary judgment will be entered against the Plaintiff with respect to Count IV and in favor of the Defendants.

## Conclusion

The statements which Plaintiff has placed at issue in this case as having been made by Garage Manager Hogan are deserving of condemnation and are unquestionably indicative of racial and/or national origin bias. But those statements, in and of themselves, do not constitute an "adverse employment action" under Title VII and did not result in or combine with other evidence of record to establish an issue of fact that any adverse employment action was taken against the Plaintiff by Defendant. For these reasons, Plaintiff's claims of race and national origin discrimination and retaliation under Title VII fail as a matter of law. Defendant's Motion for Summary Judgment will, therefore, be granted. A separate Order follows.


Robert D. Mariani
United States District Judge